# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KURT ROBINSON, | ) |
| | ) |
| Plaintiff, | ) 2:18-cv-00555-NR |
| | ) |
| v. | ) |
| | ) |
| CONSOL PENNSYLVANIA | ) |
| COAL COMPANY LLC, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

**J. Nicholas Ranjan, United States District Judge**

In November 2017, Kurt Robinson, one of only a handful of African-American employees at Consol's Bailey mine in rural southwest Pennsylvania, was working the overnight shift. During that shift, he came across a racially charged illustration of a clansman figure, which included the words "KKK" and "Grand Wizard." After Mr. Robinson reported the incident to Consol's management, Consol simply gave a lecture to its employees on the importance of not defacing company property and conducted a half-hearted interview to determine a culprit. None was found.[1]

This wasn't the first instance of hostile and unremedied racism that Mr. Robinson experienced in his 13-year career at Consol. At least twice before, other employees, including two supervisors, used the n-word in his presence; and, on two other occasions, his co-workers portrayed offensive illustrations or items in the mines, including a hangman's noose.

Against this backdrop and after the KKK drawing in 2017, Mr. Robinson filed his present lawsuit, alleging several federal and state-law claims for employment discrimination, including claims for hostile work environment. Consol has now moved for summary judgment on all claims, asserting, among

---

[1] Because this opinion addresses Consol's summary-judgment motion, unless otherwise stated, all facts are construed in the non-movant Mr. Robinson's favor. Consol disputes many of these facts.

other things, that the claims are barred for failure to exhaust administrative remedies and for failure to meet the *prima facie* elements.

Consol is partially right, and the Court will enter judgment for Consol on the Title VII claims for Mr. Robinson's failure to exhaust his administrative remedies. The Court will also enter judgment for Consol on the state-law and Section 1981 claims of intentional discrimination for Mr. Robinson's failure to meet the *prima facie* elements of those claims.

But Mr. Robinson's state-law and Section 1981 claims for hostile work environment are actionable because a jury could find Consol's conduct to be "severe or pervasive" and because the outcome of Mr. Robinson's hostile work environment claims will likely turn on a host of material disputes of fact. The Court will therefore deny summary judgment as to those claims.

## I. FACTUAL BACKGROUND

### A. Mr. Robinson's employment with Consol

Consol is an energy company with interests in coal and natural-gas production. It owns various coal mines, including the Bailey mine in Greene County, Pennsylvania. [Defs.' Stmt of Facts, ECF 30 ¶ 3]. Mr. Robinson is an African-American who began working for Consol as a "Production & Maintenance Laborer 1" in October 2006 at the Bailey mine. [*Id.* ¶ 1]. He has been promoted twice, but never to the level of a supervisor. [*Id.* ¶ 11]. He has held the same position since 2010. [*Id.* ¶ 8, ¶ 11].

While Mr. Robinson alleges lost opportunity damages in this lawsuit based on the salary he would have earned if he had been promoted to a salaried position at the Bailey mine (in particular, he believes he may have been eligible to be a salaried foreman), he never took the required exam to become a foreman. [*Id.* ¶¶ 62-69; Pl.'s Stmt of Facts, ECF 34 ¶¶ 62-69]. Mr. Robinson stated that he did not take the exam due to fear of retaliation. [ECF 34 ¶ 69].

Mr. Robinson also alleges that Consol gave him less opportunistic assignments that deprived him of certain bonus payments. [ECF 30 ¶ 70; ECF 34 ¶ 70]. According to Mr. Robinson, work crews could earn extra money by working in an area of the mine known as the "lead gate." [ECF 30 ¶ 71; ECF 34 ¶ 71]. Lead gate assignments are in high demand among the employees at the Bailey mine because of the opportunity to earn this extra money. [ECF 30 ¶ 72; ECF 34 ¶ 72]. Mr. Robinson, by his own admission, has worked at the

lead gate several times and has thus earned bonus money from those assignments. [ECF 30 ¶¶ 73-74; ECF 34 ¶¶ 73-74].

## B.     The alleged discriminatory acts

Mr. Robinson alleges he has been repeatedly discriminated against by Consol because of his race. For example:

### "Who nigger-rigged this?" (2009)

In 2009, Mr. Robinson's supervisor, Matt Ferrier, asked in his presence: "who nigger-rigged this?" [ECF 34 ¶ 116; ECF 33-3 ¶ 26]. Mr. Robinson claims he did not report the incident because another co-worker said he would tell management that he did not hear the comment. *See* [*id.*]. Consol disputes this allegation, and points to the fact that it is only supported by Mr. Robinson's own affidavit. [Defs.' Reply Stmt of Facts, ECF 35 ¶ 116].

### "N-word" (2011)

In 2011, Mr. Robinson reported that a different supervisor, Jared Polka, used the n-word once in describing a work assignment. [ECF 34 ¶ 80; ECF 33-3 ¶ 23]. Consol does not dispute that this happened and acknowledges that Mr. Polka consequently received a five-day suspension. [ECF 35 ¶ 81].

### Racist cartoon (2015)

In 2015, Mr. Robinson viewed a cartoon in the mines that depicted two African-Americans with what has been characterized as "larger lips" and "funny dress." [ECF 34 ¶¶ 83, 110-12]. Consol does not dispute that this cartoon existed; it just disputes how it became reported to the general superintendent of the mines, Eric Schubel. [ECF 35 ¶ 83]. Mr. Robinson contends that he reported the cartoon to Mr. Schubel [ECF 34 ¶ 83], though Mr. Schubel contends that a supervisor reported it to him. [ECF 35 ¶ 83]. Mr. Robinson contends that Mr. Schubel did nothing about the cartoon [ECF 34 ¶ 111], and Consol does not respond to this allegation. [ECF 35 ¶ 111].

### Hangman's noose (2016)

In 2016, a "hangman's noose" was in a mine next to the one in which Mr. Robinson works. Mr. Robinson found out about it from an African-American co-worker who worked in that adjacent mine. [ECF 34 ¶¶ 86, 108-109]. Consol admits that the noose was there. [ECF 35 ¶ 109]. According to Mr. Robinson, Consol did nothing about the noose and told no employees in his mine about it.

[ECF 34 ¶ 109]. According to Consol, it investigated the noose incident and then required all the work crews assigned to that mine to participate in employee-awareness training. [ECF 35 ¶ 109].

**KKK drawing (2017)**

On November 12, 2017, Mr. Robinson was working the overnight shift at the Bailey mine. [ECF 30 ¶ 20]. Both sides agree that at around 11:00 p.m., he approached the assistant shift foreman Travis O'Neil—who was also the acting shift supervisor that night—to report that there was an illustration of a KKK clansman labeled the "Grand Wizard" on the dust tank in the mine. [*Id.* ¶ 21; ECF 34 ¶ 21]. It is undisputed that at around 2:00 a.m., after finishing his initial shift duties, Mr. O'Neil went to the dust tank and saw that an illustration had been etched into a part of the tank called the main air control box. [ECF 30 ¶¶ 24-25; ECF 34 ¶¶ 24-25]. The etching was roughly three-square inches (about the size of an ash tray). [ECF 30 ¶ 26; ECF 34 ¶ 26]. It is undisputed that someone etched the letters "KKK" near the illustration of a face with a pointy hat, though Consol disputes that the words "clansman" or "Grand Wizard" appeared next to the illustration. [ECF 30 ¶¶ 28-29].

## C. Investigation of 2017 KKK-drawing incident

After finding the illustration, Mr. O'Neil, with the use of a grinder, ground off the etching. [ECF 30 ¶ 30; ECF 34 ¶ 30]. While he could not speak with Mr. Robinson again on the morning of November 13, he notified Mr. Robinson during their next shift, on November 14, that he saw the etching and had removed it. [ECF 30 ¶ 32; ECF 34 ¶ 32]. Before Mr. O'Neil had the chance to speak with Mr. Robinson on November 14, Mr. Robinson met separately with a human resources representative to advise her of the etching. [ECF 30 ¶ 33; ECF 34 ¶ 33]. The HR representative, in turn, notified the mine's general superintendent, Ken Harvey, about it. [ECF 30 ¶ 34; ECF 34 ¶ 34].

On November 15, 2017, Mr. O'Neil held meetings with three separate work crews, comprising all employees reporting to Mr. O'Neil that day. [ECF 30 ¶ 35; ECF 34 ¶ 35]. Shift Supervisor Mike Hamilton helped O'Neil lead the meetings. [ECF 30 ¶ 36; ECF 34 ¶ 36].

After this, there is significant dispute about Consol's attempts to address the incident. Consol claims that during the meetings with the work crews, Mr. O'Neil reiterated Consol's Policy on Workplace Harassment, "explaining to the employees that the Company was committed to maintaining a workplace free of discrimination and harassment, and that [it] would take appropriate action

in response to harassment complaints." [ECF 30 ¶ 37]. By contrast, Mr. Robinson claims that neither Mr. O'Neil nor any other supervisor went into specifics about the KKK etching, but spoke generally about the defacement of company property. [ECF 34 ¶ 37]. He claims that "Mr. O'Neil only brought up that defacing equipment is wrong but did not say anything about the racist inscription even after he was asked by a worker what was etched on the tank." [*Id.* ¶ 102].

The parties also agree that on November 15, 2017, Mr. O'Neil met separately with two employees, Donald Skavinski and Charles Lint, because they often operated the dust tanks, and were therefore the individuals most likely to have been aware of the KKK etching. [ECF 30 ¶¶ 40-41; ECF 34 ¶¶ 40-41]. The parties then diverge about whether Consol property handled the investigation.

Consol's position is that the interview failed to unearth who was responsible for the etching, although Messrs. Skavinski and Lint did tell Mr. O'Neil that they witnessed the evolution of the etching from just a head to later a head with a hat and KKK inscription. [ECF 35 ¶ 91]. After the interview, Mr. O'Neil spoke with Mr. Harvey and Ms. Conner to update them, and ultimately, that group could not determine who had etched the illustration. [ECF 30 ¶¶ 44-5].

By contrast, Mr. Robinson's position is that Mr. O'Neil made the unilateral decision that Messrs. Skavinski and Lint had nothing to do with the KKK etching, even though they admitted to witnessing the evolution of the etching, and failed to bring the two men to human resources. [ECF 34 ¶ 43]. Further, Mr. Robinson claims that the record shows that Mr. O'Neil was not familiar with Consol's EEO policy and thus did not follow it fully when he: (1) addressed the work crews; and (2) interviewed Messrs. Skavinski and Lint and decided that they were not responsible. [*Id.* ¶ 17]. No one from HR ever interviewed Messrs. Skavinski and Lint. [ECF 34 ¶ 91; ECF 35 ¶ 91].

D.  **Mr. Robinson's administrative complaints**

In December 2017, about a month after the KKK-etching incident, Mr. Robinson filled out an "Employment Discrimination Questionnaire" issued by the Pennsylvania Human Relations Commission (PHRC). [ECF 30 ¶ 48; ECF 34 ¶ 48]. In a section of the questionnaire asking Mr. Robinson to "Describe How You Were Harmed," Mr. Robinson checked a box marked "Harassment." [ECF 31-6 at 4; ECF 33-7 at 4]. Mr. Robinson marked "Race – African

American" as the basis for his claim that he was treated differently than other employees. [*Id.*]. He also placed an "X" next to the word "Retaliation." [*Id.*].

When asked for dates that he "complained about discrimination to a manager," Mr. Robinson stated "2006, 2010, 2017." [ECF 31-6 at 5; ECF 33-7 at 5]. Mr. Robinson also alleged that he had "assisted someone in complaining about discrimination" in 2015. [*Id.*]. In another section of the form, Mr. Robinson, when asked for details about his harassment allegations, stated "racial harassment in the workplace" and "see narrative." [ECF 31-6 at 7-8; ECF 33-7 at 7-8]. The "narrative" refers to several handwritten notes that Mr. Robinson appended to the questionnaire. [ECF 31-6 at 10-14; ECF 33-7 at 10-14]. The notes summarize instances of alleged harassment from 2006, 2009, and November 2017, including the incidents involving his supervisors using the n-word, the cartoon, the noose, and the KKK etching. [*Id.*].

The PHRC received Robinson's questionnaire and handwritten notes on January 22, 2018. [ECF 30 ¶ 55; ECF 34 ¶ 55]. Mr. Robinson's counsel filed this federal complaint on his behalf on May 1, 2018, which did not allege any Title VII or PHRA causes of action, but did allege a one count of violation of 28 U.S.C. §1981. [ECF 1]. After submitting the PHRC questionnaire, Mr. Robinson did not receive any written response from the PHRC until almost a year later, on December 10, 2018. [ECF 30 ¶ 56; ECF 34 ¶ 56].

The December 10, 2018, letter advised Mr. Robinson that the investigator assigned to his case was requesting additional information from him so that she could draft a complaint. [ECF 31-6 at 15; ECF 33-7 at 15]. Mr. Robinson's counsel responded to her, and the investigator told counsel for Mr. Robinson that she would talk to her legal department since the federal pleadings had been filed. [ECF 33-7 at 18].

Roughly two months later, on February 22, 2019, the PHRC sent a right-to-sue letter to Mr. Robinson, stating that "you now have the right to file a complaint in the appropriate court of common pleas." It also stated:

> It has been one year since you filed your complaint with the Pennsylvania Human Relations Commission (PHRC). As you are aware, the U.S. Equal Employment Opportunity Commission (EEOC) has docketed and is processing your complaint. The PHRC has been holding your complaint in abeyance pending the completion of EEOC's processing of your case.

[ECF 31-6 at 16; ECF 33-7 at 16].

After receiving this correspondence, Mr. Robinson's attorney contacted the EEOC, although there is no affidavit in the record from Mr. Robinson's attorney to this effect, only an affidavit from Mr. Robinson.[2] [ECF 33-3]. According to Mr. Robinson's affidavit, his attorney spoke with someone who worked at the EEOC named Roosevelt Bryant, who informed counsel by phone that the EEOC had never received a complaint nor was it processing anything for Mr. Robinson as stated in the PHRC's February 22, 2019, letter. [ECF 33-3 ¶ 31; ECF 34 ¶ 121]. According to Mr. Robinson's affidavit, Mr. Bryant at the EEOC told Mr. Robinson's counsel that the complaint with the PHRC and EEOC was therefore "exhausted," in his opinion. [*Id.*].

## II. PROCEDURAL BACKGROUND

On May 1, 2018, Mr. Robinson filed his initial complaint, which stated a one-count claim for violation of Section 1981. [ECF 1]. Mr. Robinson received a right-to-sue letter from the PHRC on February 22, 2019, and his counsel allegedly received oral permission to sue by the EEOC soon after. [ECF 33-3 ¶ 31; ECF 34 ¶ 121]. Mr. Robinson sought leave to amend on March 22, 2109, which was granted that same day. [ECF 19 and 20].

Mr. Robinson filed his operative amended complaint on March 25, 2019 [ECF 22], which asserts four counts for: 1) violation of Section 1981 (under both intentional discrimination and hostile work environment theories); 2) violation of Title VII based on intentional discrimination; 3) violation of the PHRA based on intentional discrimination; and 4) violations of Title VII and the PHRA for hostile work environment.

Consol has moved for summary judgment on all claims. [ECF 28].

---

[2] This portion of Mr. Robinson's affidavit is improper, as "[a]n affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Mr. Robinson has not established that he has personal knowledge of his counsel's phone call with the EEOC and thus this portion of his affidavit is inadmissible hearsay. *See* Fed. R. Evid. 801(c); Fed. R. Evid. 802.

## III. LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At summary judgment, the inquiry is whether the evidence presents "a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). In making this determination, a court must "consider all evidence in the light most favorable to the party opposing the motion." *A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791, 794 (3d Cir. 2007).

"[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party" and the non-moving party "must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp. Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) (citation omitted). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted. *Celotext Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## IV. DISCUSSION & ANALYSIS

Consol makes mainly three arguments in its summary-judgment motion: (1) Mr. Robinson failed to exhaust administrative remedies for his PHRA and Title VII claims; (2) Mr. Robinson failed to show an adverse employment action for his discrimination claims; and (3) Mr. Robinson failed to establish the requisite severity or employer liability for his hostile work environment claims. Each argument will be discussed in turn.

### A. Mr. Robinson exhausted the administrative remedies for his PHRA claims, but not his Title VII ones.

Under the PHRA, an "administrative charge must be filed by a complainant with the PHRC within 180 days of the alleged discrimination." *Burgh v. Borough Council of Montrose*, 251 F.3d 465, 471 (3d Cir. 2001) (citing 43 Pa. C.S. § 959(h)). The PHRC "has exclusive jurisdiction over the claim for a period of one year in order to investigate and, if possible, conciliate the matter." *Id.* at 471. "A complainant may not file an action in court for a period of one year." *Id.* "If the PHRC does not resolve the administrative charge within one year, the commission must notify the complainant that he may

bring an action in the Court of Common Pleas." *Id.* (citing 43 Pa.C.S. § 962(c)(1)); *see also Snyder v. Pa. Ass'n of School Retirees*, 566 A.2d 1235, 1240 (Pa. Super. Ct. 1989). Notice of the right to sue is not required in order to bring a PHRA action. Instead, after one year has elapsed, a complainant may bring a court action no matter if he has received a letter from the PHRC. *See Snyder*, 566 A.2d at 1240.

By contrast, under Title VII, if a complainant "initiates a complaint with a parallel state agency, . . . the period for filing the charge with the EEOC is extended to 300 days from the date of the alleged unlawful employment practice." *Burgh*, 251 F.3d at 470 (citing 42 U.S.C. § 2000e–5(e)(1)). "If, after 180 days, the EEOC has not resolved the charge, it must notify the complainant, generally through the issuance of a 'right-to-sue' letter, in which the EEOC states that it sees no reason to take action on the complaint." *Id.* (citations omitted). "A complainant may not bring a Title VII suit without having first received a right-to-sue letter." *Id.; Price v. Schwan's Home Servs., Inc.,* Civ. No. 05-220, 2006 WL 897721, at *4 (W.D. Pa. Apr. 3, 2006) ("Plaintiff's failure to obtain a right-to-sue letter for his Title VII claim is fatal to that claim.") (citations omitted). There are only narrow exceptions to this rule. *See Collins v. Kimberly–Clark Pa., LLC*, 247 F.Supp.3d 571, 586 (E.D. Pa. 2017) ("[W]here the relevant federal agency has failed to issue the letter even though the 180-day deadline has expired, other courts have allowed a plaintiff to maintain a Title VII action provided that she can show that she is entitled to the right-to-sue letter and has requested it.") (quotations and citation omitted).

With this background in mind, the Court finds that Mr. Robinson has exhausted administrative remedies for his PHRA claims because he submitted a PHRC questionnaire and received a right-to-sue letter from the PHRC. By contrast, he has not exhausted remedies for his Title VII claims because he never submitted anything to the EEOC and did not receive, or even request, a right-to-sue letter from the EEOC.

> *i. Mr. Robinson exhausted his PHRA claims when he submitted the PHRC questionnaire and received a right-to-sue letter.*

A questionnaire submitted to the PHRC can constitute "complaint" or "charge" under the PHRA. That is, "the Pennsylvania Code does not require a PHRC complaint to be labelled as such in order to be considered a complaint under the statute, merely that it contain certain information." *Mergl v. Kill*, No. 1899 WDA 2017, 2018 WL 5659756, at *3 (Pa. Super Ct. Oct. 31, 2018)

(citing 16 Pa. Code § 42.32). "The complaint, or charge of discrimination, must contain: the name and address of the complainant, the names and addresses of the individual(s) and/or institution that has allegedly committed the discrimination, the particulars of the unlawful discrimination, a verification consisting of a sworn oath or affirmation or an unsworn statement by the signer indicating that the complaint is made subject to the penalties outlined in 18 Pa.C.S. § 4904, and any other information requested by the PHRC." *Id.* (citing 16 Pa. Code § 42.32). Further, "[t]he substance of the filing is what is most important, not how the aggrieved party . . . labels the document." *Id.; see also Garlick v. Lock Haven Univ.,* No. 540 C.D.2008, 2008 WL 9405237, at *1 (Pa. Commw. Ct. Dec. 9, 2008) ("Garlick submitted questionnaire forms constituting a complaint with the PHRC on December 23, 2005.").

Here, Mr. Robinson submitted a questionnaire to the PHRC within 180 days of discovering the KKK etching in the Bailey mine. [ECF 31-6 at 2; ECF 33-7 at 2]. That questionnaire met all the specifications outlined in 16 Pa. Code § 42.32. It stated: "the name and address of the complainant" (Kurt Lee Robinson of Uniontown, PA), "the names and addresses of the individual(s) and/or institution that has allegedly committed the discrimination" (Consol), "the particulars of the unlawful discrimination" (described throughout the questionnaire and in the attached narrative), "a verification consisting of a sworn oath or affirmation or an unsworn statement by the signer indicating that the complaint is made subject to the penalties outlined in 18 Pa.C.S. § 4904" (on the last page of the questionnaire), and "any other information requested by the PHRC" (contained in the attached narrative). *See* [ECF 31-6 at 3-14; ECF 33-7 at 3-14]. The Court thus concludes that the PHRC questionnaire constitutes a proper complaint with the PHRC.

What's more, Mr. Robinson received a right-to-sue letter from the PHRC on February 22, 2019, though technically at that point he did not even need one since his PHRC charge had been pending for over a year. Even so, this is more evidence that Mr. Robinson exhausted his remedies before the PHRC. *See Lukus v. Westinghouse Elec. Corp.*, 419 A.2d 431, 453-54 (Pa. Super. Ct. 1980) (finding the "right to sue" letter expands the rights of victims to provide an "unconditional right to seek redress in court").

Consol also makes a variation of its exhaustion argument by contending that the PHRA claims in the amended complaint are not the same ones in the questionnaire. But that's too narrow a reading of both the law and the questionnaire.

"The test in the Third Circuit for exhaustion of administrative remedies is 'whether the acts alleged in the subsequent . . . suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom.'" *Weems v. Kehe Food Distributors, Inc.*, 804 F.Supp.2d 339, 342 (E.D. Pa. 2011) (quoting *Antol v. Perry*, 82 F.3d 1291, 1295 (3d Cir. 1996)). This determination "turns on whether there is a close nexus between the facts supporting each claim or whether additional charges made in the judicial complaint may fairly be considered explanations of the original charge or growing out of it." *Yang v. Astrazeneca*, No. 04-4626, 2005 WL 327539, at *3 (E.D. Pa. Feb. 10, 2005) (citation omitted).

Here, Mr. Robinson's PHRA claims for race discrimination and hostile work environment are based on the same facts as alleged in the PHRC questionnaire. "[T]he kinds of claims that are considered exhausted though not specifically mentioned in the prior . . . charge either arise during the pendency of the . . . investigation, or are closely related to conduct alleged in the charge ... or are considered explanations of the original charge." *Cross v. Donahoe*, Civ. No. 12–2670, 2014 U.S. Dist. LEXIS 189406, at *9 (D.N.J. May 30, 2014) (internal quotations omitted); *see also Collins*, 247 F.Supp.3d at 587 ("Because Plaintiff's Title VII race discrimination claim is based on the same facts as the Title VII gender discrimination charge asserted in Plaintiff's 2011 EEOC Charge, and because the legal analysis is the same for claims of race and gender discrimination under Title VII, this Court will consider Plaintiff's claim of race discrimination under Title VII.").

The Court finds that the PHRA claims presented here are within the scope of the PHRC questionnaire. As admitted by Consol, when the questionnaire asked, in section 4, to describe "how you were harmed and when," Mr. Robinson checked "Harassment." [ECF 30 ¶ 49]. His narrative that accompanied the questionnaire summarized "instances of alleged harassment" [*id.* ¶ 54] from 2006, 2009, and November 2017, including the incidents involving his supervisors using the n-word, the cartoon, the hangman's noose, and the KKK etching. [ECF 31-6 at 10-14; ECF 33-7 at 10-14]. These facts, as alleged in the PHRC questionnaire, are the same facts that support Mr. Robinson's PHRA claims for race discrimination and hostile work environment. As a result, these claims are not outside the scope of those provided in the questionnaire.

> *ii. Mr. Robinson did not exhaust his remedies under Title VII and is not entitled to equitable relief.*

While Mr. Robinson exhausted his state-law claims before the PHRC, he failed to exhaust his Title VII claims before the EEOC. This is so for at least three reasons.

First, Mr. Robinson does not allege that he submitted anything to the EEOC. The PHRC questionnaire could have sufficed to exhaust his remedies if it had been filed with the EEOC. But Mr. Robinson never alleges that he filed that questionnaire or signified to the PHRC that he wished for it be cross-filed with the EEOC.

Second, a right-to-sue letter from the EEOC is required for a plaintiff to bring a Title VII claim, and Mr. Robinson never received one. "The receipt of the right-to-sue letter indicates that a complainant has exhausted administrative remedies, an essential element for bringing a claim in court under Title VII." *Burgh,* 251 F.3d at 470; *Ostapowicz v. Johnson Bronze Co.,* 541 F.2d 394, 398 (3d Cir. 1976) (preliminary steps of the filing of the EEOC charge and the receipt of the right to sue notification are "essential parts of the statutory plan"). "A complainant may not bring a Title VII suit without having first received a right-to-sue letter." *Burgh,* 251 F.3d at 470.

Third, Mr. Robinson cannot rely on any equitable exceptions to exhaustion to save his Title VII claims. Exhaustion is a non-jurisdictional requirement subject to equitable exceptions. But the exceptions only apply when the plaintiff has at least asked for a right-to-sue letter, which Mr. Robinson never did. *See Story v. Mechling*, 214 F. App'x 161, 163 (3d Cir. 2007) (holding equitable exceptions did not apply because plaintiff "has provided no evidence he requested the letter, nor any evidence of when he did so").

Nor does Mr. Robinson's attorney's oral communication with an EEOC investigator support an equitable exception. Mr. Robinson claims that his lawyer spoke to an EEOC employee named Roosevelt Bryant who told his lawyer that the Title VII claim was exhausted. Initially, this evidence is inadmissible hearsay. But even if it could be converted into an admissible form at trial, advice given by an agency employee (whether erroneous or otherwise) does not excuse a total failure to file the required documents with the EEOC. *See Gilbert v. Napolitano*, 958 F. Supp. 2d 9, 16 (D.D.C. 2013) ("First, even assuming Investigator Munoz incorrectly advised plaintiff that he need not take any steps to bring claims based on the Milne promotion, that would at

most excuse plaintiff's failure to pursue administrative relief within the proscribed time limits; it would not excuse his total 'failure to exhaust or even to begin his administrative remedies.'") (citation omitted); *Siegel v. Kreps*, 654 F.2d 773, 778 n. 14 (D.C. Cir. 1981) ("Even if appellant had established a justifiable reliance on ... erroneous advice, he would, at most, be entitled to a waiver of the time limits for the initiation of a complaint with the administrative agency rather than to the right to institute a civil action.").

For these reasons, Mr. Robinson's Title VII claims were not administratively exhausted and will be dismissed from the case. Specifically, Count 2 will be dismissed in its entirety and Count 4 will be dismissed in part insofar as it alleges a Title VII hostile work environment claim.

**B. Mr. Robinson has failed to establish a *prima facie* case for his discrimination claims, but has done so for his hostile work environment claims.**

Since the Title VII claims have been dismissed because of exhaustion, only Mr. Robinson's claims for intentional discrimination and hostile work environment under the PHRA and Section 1981 remain.[3]

The amended complaint alleges intentional discrimination under the PHRA and Section 1981. These claims fail as a matter of law because Mr. Robinson cannot show that he suffered an adverse employment action.

To establish a *prima facie* case of race discrimination under the PHRA or Section 1981 (or even Title VII, for that matter), the plaintiff must show,

---

[3] While Consol argues that Mr. Robinson's Section 1981 claim only sounds in race discrimination and not hostile work environment [ECF 29 at 11 n.1], the Court finds that the claim at Count 1 sounds in both. According to paragraph 48 of the amended complaint, "[t]he Defendant intentionally discriminated against Plaintiff as more fully described above, and more specifically below, due to his race: African American." As a result, the allegations in Count 1 incorporate all allegations of race discrimination and hostile work environment that are found both above and below. Thus, Mr. Robinson's Section 1981 claim alleges both direct race discrimination and hostile work environment. *See, e.g., Garrett v. U.S. Dept. of Veterans Affairs*, No. 05–1164, 2007 WL 1875535, at *6 (D.N.J. June 28, 2007) ("Plaintiff's hostile work environment claim incorporated by reference the previous allegations in the complaint (paragraphs 1–45), and thus, was arguably based on conduct besides the allegations in paragraphs 15 (penultimate sentence), 40, 41, and 43.").

among other things, that he suffered an adverse employment action. *Makky v. Chertoff,* 541 F.3d 205, 214 (3d Cir. 2008) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)); *Walker v. Centocor Ortho Biotech, Inc.,* 558 F. App'x 216, 218 (3d Cir. 2014).

An "adverse employment action" is "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004) (internal quotation marks omitted). It "includes actions that are more than trivial or minor changes in an employee's working conditions, such as suspension without pay and transfer to an undesirable position." *Zurchin v. Ambridge Area Sch. Dist.*, 300 F. Supp. 3d 681, 689 (W.D. Pa. 2018) (citations and quotations omitted); *see also Witcher v. Sodexho, Inc.,* 247 F. App'x 328, 331 (3d Cir. 2007) (finding no adverse employment action where plaintiff "has not suggested that Sodexho fired or demoted him" and "has not alleged that his pay was reduced, he was suspended without pay, or suffered any other reduction in benefits or change in employment conditions;" rather, plaintiff only alleged that he was upset and driven into a depression by ageist comments).

Here, Mr. Robinson cannot establish that he suffered an "adverse employment action." He vaguely alleges in his amended complaint that, at some unspecified time, Consol passed him over for promotion to a management position; yet Mr. Robinson never applied for a supervisory position and never took the test required to become qualified for such a position. [ECF 30 ¶¶ 62-69; ECF 34 ¶¶ 62-69]. His claim that Consol failed to promote him is far too speculative, not bound by any timeframe, and supported only by Mr. Robinson's own affidavit. *See Mosley v. City of Pittsburgh Public School Dist.,* No. 07–1560, 2009 WL 2948519, at *1 (W.D. Pa. Sept. 8, 2009) ("Statements in affidavits made only on belief or on information and belief may not be considered in support of or in opposition to summary judgment. . . . Indeed, courts routinely grant motions to strike affidavits . . . which contain conclusory language, vague assertions, gross speculation and inferences.") (citations omitted).

Mr. Robinson also alleges that, at unspecified times, Consol gave him less opportunistic assignments that deprived him of certain bonus payments. [ECF 30 ¶ 70; ECF 34 ¶ 70]. But these allegations too are vague, unrelated to any timeframe, and thus do not reflect the types of "adverse employment actions" recognized by the Third Circuit. *See Walker*, 558 F. App'x at 219 (finding none of these nine events constituted an "adverse employment action":

(1) supervisor's allegedly negative performance review; (2) supervisor's delays in approving expense reports; (3) supervisor's attempted realignment of plaintiff's sales territory; (4) supervisor's assignment of drug launch programs to a white manager; (5) supervisor's expression of dislike for another African-American sales representative; (6) supervisor's failure to provide a budget report to plaintiff; (7) supervisor's questioning of plaintiff's hiring of a minority candidate; (8) supervisor's requirement that plaintiff use a car rather than a train for some business travel; and (9) supervisor's failure to provide plaintiff support in her management of subordinates).

Because Mr. Robinson has failed to establish that he suffered any tangible adverse employment action, his PHRA and Section 1981 claims for race discrimination fail as a matter of law.

While Mr. Robinson cannot meet his *prima facie* burden to establish intentional discrimination, his hostile work environment claims are a different matter. For those claims, the harassment itself constitutes the "adverse employment action." *See Greer v. Mondelez Global, Inc.,* 590 F. App'x 170, 173 (3d Cir. 2014) ("Alternatively, a plaintiff may prove an adverse employment action by proving that he or she was subjected to a hostile work environment.").

For a hostile work environment claim under the PHRA or Section 1981, the claim "must be assessed with respect to the totality of the circumstances." *Sherrod v. Philadelphia Gas Works*, 209 F. Supp. 2d 443, 451-52 (E.D. Pa. 2002) (citing *Harris v. Forklift Systems Inc.,* 510 U.S. 17, 23 (1993)). More specifically, the court must examine the frequency of the alleged conduct, its severity, whether it was physically threatening or a mere offensive utterance, and whether it unreasonably interfered with the plaintiff's work performance. *Id.* at 452 (citing *Harris*, 510 U.S. at 23). The Third Circuit has refined this test to include these five elements:

> (1) the employee suffered intentional discrimination because of the protected activity; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the employee; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present.

*Griffin v. Harrisburg Prop. Servs.*, 421 F. App'x 204, 207 (3d Cir. 2011).

Consol argues that Mr. Robinson fails to establish a *prima facie* case of hostile work environment because: (1) the harassment was neither "severe

[n]or pervasive"; and (2) Consol took appropriate remedial action so that its "basis for employer liability" is not present. These arguments are unavailing at the summary-judgment stage, for at least the two following reasons.

First, the Third Circuit has held that even one isolated incident can amount to harassment sufficiently "severe or pervasive" to make out a *prima facie* case of hostile work environment. In *Castleberry v. STI Group*, 863 F.3d 259, 262 (3d Cir. 2017), an African-American plaintiff was working on a fence-removal project when a supervisor told him and his coworkers that if they had "nigger-rigged" the fence, they would be fired. The Third Circuit concluded that the supervisor's single use of the "n-word" was adequately "severe" to state a claim for hostile work environment. *Id.* at 265-66. In particular, the Third Circuit cited *Adams v. Austal, U.S.A., LLC*, 754 F.3d 1240, 1254 (11th Cir. 2014) for the proposition that "although a racially offensive carving on a workplace wall 'was an isolated act, it was severe' enough that a 'reasonable jury could find that plaintiff's work environment was objectively hostile.'" *Castleberry*, 863 F.3d at 265.

Here, the November 2017 KKK etching is like, and perhaps worse than, the use of the n-word in *Castleberry* and the offensive carving in *Adams*. Standing alone, this one instance could allow a reasonable jury to find that the Mr. Robinson's work environment at Consol was objectively hostile. This does not even consider the many other instances of racially charged conduct that Mr. Robinson was subjected to, including the hangman's noose in the mine—all of which a jury could fairly consider in determining the hostility of Mr. Robinson's workplace.[4]

Second, there are material disputes of fact over whether Consol took appropriate remedial action sufficient to eliminate any "basis for employer

---

[4] A jury could also reasonably conclude that the racial hostility of these incidents was enhanced in the context of Mr. Robinson's particular workplace—a mine—which is an environment with obvious inherent dangers. Within this already dangerous setting, a jury could find that co-workers and supervisors depicting racially violent items and images would create a particularly hostile and threatening environment. *See, e.g., Zelinski v. Pa. State Police,* 108 F. App'x 700, 704-05 (3d Cir .2004) (where male police officer failed to provide a female police officer "with adequate protection in the dangerous and sometimes deadly world of drug law enforcement," it "becomes more apparent that [plaintiff] may have been exposed to a hostile work environment.").

liability." Employers are liable for the actions of a plaintiff's non-supervisory coworkers only if (1) "the employer failed to provide a reasonable avenue for complaint" or (2) "the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." *In re Tribune Media Co.*, 902 F.3d 384, 400 (3d Cir. 2018) (quoting *Huston v. Procter & Gamble Paper Products Corp.*, 568 F.3d 100, 104 (3d Cir. 2009)). "Phrased another way, 'an employer may be directly liable for non-supervisory co-worker ... harassment only if the employer was negligent in failing to discover the co-worker harassment or in responding to a report of such harassment.'" *Felder v. Penn Mfg. Industries, Inc.*, 303 F.R.D. 241, 244 (E.D. Pa. 2014) (quoting *Huston*, 568 F.3d at 104-05). An employer's investigation into a harassment complaint need not be perfect to satisfy this standard. *Knabe v. Boury Corp.*, 114 F.3d 407, 412 (3d Cir. 1997). Instead, whether an employer's response is adequate turns on "whether the action was reasonably calculated to prevent further harassment." *Id.*

Looking at the September 2017 KKK etching alone, and its aftermath, there is a genuine dispute of material fact as to whether Consol handled the event appropriately and took "prompt and adequate remedial action" as it says it did. In particular, there is dispute as to what Mr. O'Neil said to the work crews (whether he discussed Consol's Policy on Workplace Harassment or instead just discussed defacing company property) and whether his interview of Donald Skavinski and Charles Lint was sufficient to justify clearing them of wrongdoing. Indeed, even the undisputed facts could lead a reasonable jury to determine that Consol was negligent in its remedial measures. That is, it is undisputed that Mr. O'Neil only interviewed two men; that HR never interviewed even those two; that the two employees admitted to having seen the progress of the KKK etching over time; that no perpetrator was found; and that Consol didn't punish anyone as a result of the incident.

Thus, at a minimum, there are disputes of material fact on employer liability, which preclude summary judgment.[5]

---

[5] Consol also argues that Mr. Robinson's claims are barred by the statute of limitations. Not so. Looking at the 2017 KKK incident alone, that incident is actionable and within the 180-day PHRA and 4-year Section 1981 limitations periods. Other prior incidents too may be within the limitations periods, either standing alone or based on a "continuing violation" theory. But whether the Court will permit the parties to introduce the prior incidents at trial is an issue that is better suited for resolution on a motion *in limine*. *See, e.g., Stewart v. Rutgers*, 120 F.3d 426, 433 (3d Cir. 1997) ("While the district court was correct

## V. CONCLUSION

For the reasons discussed above, Consol's Motion for Summary Judgment [ECF 28] will be **GRANTED in part** and **DENIED in part**. Mr. Robinson's claims for hostile work environment under Section 1981 and the PHRA, as found in Counts 1 and 4, survive, and all remaining claims are **DISMISSED with prejudice**. An appropriate order follows.

DATED this 27th day of November, 2019.

BY THE COURT:

*/s/ J. Nicholas Ranjan*
United States District Judge

---

in finding that any discrimination claim based on Stewart's 1992–93 tenure denial is time-barred, we reject the notion that the events surrounding that denial are not relevant evidence which Stewart could use at trial."); *United Air Lines v. Evans*, 431 U.S. 553, 558 (1977). For now, because at least one actionable event occurred within the limitations periods, the hostile work environment claims are not time-barred.